IRA D. KHARASCH (CA Bar #109084)
JAMES K.T. HUNTER (CA Bar #73369)
PACHULSKI STANG ZIEHL & JONES LLP
10100 Santa Monica Blvd., Suite 1100
Los Angeles, California  90067
Telephone:    (310) 277-6910
Facsimile:    (310) 201-0760
Email: ikharasch@pszjlaw.com
        jhunter@pszjlaw.com

Counsel for Defendant Modtech Structures LLC

# UNITED STATES BANKRUPTCY COURT

## CENTRAL DISTRICT OF CALIFORNIA

### RIVERSIDE DIVISION

| | |
|---|---|
| In re<br><br>MODTECH HOLDINGS, INC.,<br><br>　　　　Debtor and Debtor-in-Possession. | Case No. 6:08-bk-24324-TD<br><br>Chapter 11 |
| MONTELEONE & MCCRORY, LLP,<br><br>　　　　Plaintiff,<br><br>vs.<br><br>MODTECH HOLDINGS, INC., and MODTECH STRUCTURES LLC,<br><br>　　　　Defendants. | Adv. Case No. 6:09-ap-01268-TD<br><br>**NOTICE OF MOTION AND MOTION OF DEFENDANT MODTECH STRUCTURES LLC FOR SUMMARY JUDGMENT; MEMORANDUM OF POINTS AND AUTHORITIES**<br><br><u>Live Hearing:</u><br>**DATE:　　January 28, 2010**<br>**TIME:　　10:00 a.m.**<br>**PLACE:　　Courtroom 1345**<br>**　　　　　　255 E. Temple Street**<br>**　　　　　　Los Angeles, CA  9012**<br><br>-and-<br><br><u>Via Video Conference</u><br>**DATE:　　January 28, 2010**<br>**TIME:　　10:00 a.m.**<br>**PLACE:　　Courtroom 303**<br>**　　　　　　3420 Twelfth Street**<br>**　　　　　　Riverside, CA  92501** |

1   **TO ALL PARTIES AND THEIR ATTORNEYS OF RECORD:**

2       **PLEASE TAKE NOTICE** that on January 28, 2010, at 10:00 a.m. or as soon thereafter as

3   counsel may be heard, in the Courtroom of the Honorable Thomas B. Donovan, located at the

4   Edward R. Roybal Federal Building, 255 E. Temple Street, Los Angeles, CA 90012, defendant

5   Modtech Structures LLC will, and hereby does, move the Court for a Summary Judgment. This

6   Motion is made pursuant to Rule 56(c) of the Federal Rules of Civil Procedure made applicable to

7   this proceeding by Federal Rule of Bankruptcy Procedure Rule 7056.

8       This Motion is based upon this Notice of Motion and Motion, the accompanying

9   Memorandum of Points and Authorities, the Amended Stipulation of Undisputed Facts (with

10  Exhibits "A" and "B" attached) [Docket No. 13], the Statement of Uncontroverted Facts and

11  Conclusions of Law filed concurrently herewith, all other pleadings and papers on file in this action,

12  such matters of which the Court may take judicial notice, and such other oral and documentary

13  evidence and argument as may be presented by the parties at the hearing.

14      **PLEASE TAKE FURTHER NOTICE** that pursuant to the Stipulation of Hearings on

15  Competing Motions for Summary Judgment [Docket No. 12], responses, if any, to the Motion shall

16  be filed with the Court and served on Movants' counsel no later than January 14, 2009 at the

17  following address:

18      James K.T. Hunter, Esq.

19      Pachulski Stang Ziehl & Jones LLP

20      10100 Santa Monica Blvd., 11th Floor

21      Los Angeles, CA 90067

22      **PLEASE TAKE FURTHER NOTICE** that pursuant to Local Bankruptcy Rule 9013-

23  1(a)(11), failure to timely file and serve a response or opposition to the Motion may be deemed

24  consent to the relief requested herein.

25  Dated:    December 28, 2009    PACHULSKI STANG ZIEHL & JONES LLP

26

27      By    */s/ James K.T. Hunter*
            James K.T. Hunter

28              Counsel for Defendant Modtech Structures LLC

51404-008\DOCS_LA:212779.1

## MEMORANDUM OF POINTS AND AUTHORITIES

## I.    INTRODUCTION

Plaintiff Monteleone & McCrory LLP ("M&M") is a law firm which represented Debtor and Debtor in Possession Modtech Holdings, Inc. ("Modtech") with respect to various commercial contract matters prior to Modtech's filing for bankruptcy on October 20, 2008.  At the time Modtech filed for bankruptcy, the amount owed to M&M for legal fees, costs and expert fees was $776,336.39 (the "Pre-Petition Fees/Costs"); and the only issue in dispute between M&M and Defendants is whether M&M (1) is entitled to an allowed unsecured claim for the Pre-Petition Fees/Costs or (2) has a valid, perfected attorneys' lien (the "Claimed M&M Attorneys' Lien") on any recoveries by Modtech arising from any matter where M&M was retained to act or did act on Modtech's behalf (the "M&M Matter Recoveries") by virtue of a provision in the original, written M&M/Modtech fee agreement ("Retainer Agreement") purporting to grant such a lien to M&M.  As of now, Debtor is holding $360,248.01 in M&M Matter Recoveries and that total may increase in the future as a result of additional recoveries on pending matters presently being handled by M&M.

The parties have stipulated to what both sides believe are all facts necessary to allow this Court to determine all issues as to the validity and perfection of the Claimed M&M Attorneys' Lien. (See the Amended Stipulation of Undisputed Facts (with Exhibits "A" and B" attached) [Docket No. 13] ("SOF"), a copy of which is attached as Exhibit "1" for the Court's convenience.)  Moving defendant Modtech Structures LLC ("MSL"), which purchased the M&M Matter Recoveries from Modtech subject to, and contingent upon, the final determination of the validity, priority, extent and amount of the Claimed M&M Attorneys' Lien, submits, and by the instant Motion seeks to establish, that the Claimed M&M Attorneys' Lien was invalid ab initio, and in any event was not properly perfected, in that:

1.    the Claimed M&M Attorneys' Lien constitutes an interest adverse to Plaintiff which, pursuant to Rule 3-300 of the California Rules of Professional Conduct, is invalid where, as here, M&M did not fully explain the potential adverse effects of such a lien to Modtech in advance of its creation; and

2.    in order for an attorney's lien to be perfected on commercial and contract claims of

1

1    the nature asserted and defended by M&M on behalf of Modtech, M&M was required to, but did not,

2    file a UCC financing statement with the California Secretary of State.

3                              **II.      BACKGROUND FACTS**

4            At all relevant times, Ron Savona ("Savona") was Modtech's Chief Operating Officer

5    ("COO").  (SOF, Facts 1 and 2.)

6            At some point in time in the fall of 2004, Savona came to the conclusion that Modtech

7    needed to retain legal counsel to assist it with a variety of legal issues and/or matters, including, but

8    not limited to contract and construction related issues.  (SOF, Fact 8.)

9            In early November, 2004, Ron Savona and others at Modtech met with Pat Duffy ("Duffy")

10   of M&M at the Modtech's offices in Perris, California for purposes of discussing certain legal

11   matters retaining Duffy and M&M.  (SOF, Fact 9.)

12           At the November, 2004 meeting at Modtech's offices, Savona retained Duffy and M&M to

13   represent Modtech.  (SOF, Fact 11.)

14           Exhibit "A" attached to the SOF is a true and correct copy of the November 12, 2004 written

15   retainer agreement (the "Retainer Agreement") entered into between Modtech and M&M for the

16   provision of legal services by the firm.  (SOF, Fact 14.)

17           Savona executed the Retainer Agreement as COO of Modtech in November, 2004 after first

18   reviewing it.  (SOF, Fact 15.)

19           Ron Savona was given a reasonable period of time to consult with other counsel of his

20   choosing regarding the terms and conditions contained within the Retainer Agreement.  (SOF, Fact

21   18.)

22           Savona chose not to consult with another lawyer regarding the terms and conditions

23   contained within Exhibit "A", the Retainer Agreement.  (SOF, Fact 19.)

24           Neither Savona nor Duffy, who were the sole representatives of Modtech and M&M,

25   respectively, and who communicated with each other regarding Modtech's retention of M&M prior

26   to Savona's execution of the Retainer Agreement, recall any specific discussion or communication

27   regarding the "lien" language set forth on page four of the Retainer Agreement prior to Savona's

28   execution of the Retainer Agreement.  (SOF, Fact 21.)

1    At the time Modtech filed for bankruptcy protection on October 20, 2008, Modtech owed

2    M&M $776,336.39 in legal fees, costs and expert fees. (SOF, Fact 34.)

3    M&M never filed a UCC financing statement with the California Secretary of State with

4    respect to any lien or other rights against Modtech arising under or by reason of the Retainer

5    Agreement. (SOF, Fact 36.)

6    All of the existing or future recoveries to which M&M contends its lien currently attaches, or

7    will in the future attach, are or will be the result of, or based on, commercial contract claims. (SOF,

8    Fact 38.)

9    Modtech filed for bankruptcy protection on October 20, 2008. (SOF, Fact 39.)

10    Subsequent to Modtech's bankruptcy filing, M&M was retained, by Order of the Bankruptcy

11    Court, as Special Counsel to Modtech in connection with (a) Porter/Kennedy Elementary Schools;

12    (b) Heritage High School; (c) Monroe Middle School; and (d) J T Plastering matters. As part of the

13    Orders appointing M&M as Special Counsel to Modtech, M&M agreed, among other things, to

14    place any and all settlement and litigation proceeds obtained on behalf of Modtech into a blocked

15    DIP account (in accordance with the specific orders of the court pertaining to M&M's right to

16    recover attorney's fees and costs out of such recoveries). (SOF, Fact 41.)

17    Subsequent to October 20, 2008 and after being retained as Special Counsel for Modtech,

18    M&M has recovered certain monies in connection with the JT Plastering and Heritage High School

19    matters, in the respective sums of $46,519.66 and $313,728.35, after deducting for court-

20    ordered/agreed upon fees and costs. (SOF, Fact 43.)

21    The monies recovered on behalf of Modtech by M&M in connection with the JT Plastering

22    and Heritage High School matters have been placed in a blocked DIP account maintained by

23    Modtech and identified as "Modtech Litigation Fund Account" maintained in U S Bank as "ABA

24    #122-235-821". (SOF, Fact 44.)

25    On November 12, 2009, Laurus Master Fund, Ltd., a Cayman Islands company (In

26    Liquidation), Valens Offshore SPVII, Corp., a Delaware corporation and Valens U.S. SPV I, LLC, a

27    Delaware limited liability company, purchased and designated MSL to take title to certain assets of

28    Modtech (following an Order of the Bankruptcy Court entered on September 3, 2009), including but

not limited to the claims, causes of action and proceeds from the same (litigation settlement

proceeds), known as the (a) Porter/Kennedy Elementary Schools; (b) Heritage High School; (c)

Monroe Middle School; and (d) J T Plastering matters, subject to, and contingent upon, the final

determination of the validity, priority, extent and amount of the M&M claimed attorney's lien, and

further order this Court (the "Modtech Purchased Assets"). (SOF, Fact 46.)

On November 12, 2009, MSL acquired title to the Modtech Purchased Assets, subject to, and

contingent upon, the final determination of the validity, priority, extent and amount of the M&M

claimed attorney's lien, and further order of this Court. (SOF, Fact 47.)

## III.    DISCUSSION

**A.    The Claimed M&M Attorneys' Lien Is Invalid Due To M&M's Failure To Fully Explain The Potential Adverse Effects Of Such A Lien To Modtech**

Rule 3-300 of the California Rules of Professional Conduct provides as follows:

"A member shall not enter into a business transaction with a client; or knowingly acquire an ownership, possessory, security, or other pecuniary interest adverse to a client, unless each of the following requirements has been satisfied:

(A)    The transaction or acquisition and its terms are fair and reasonable to the client and are fully disclosed and transmitted in writing to the client in a manner which should reasonably have been understood by the client; and

(B)    The client is advised in writing that the client may seek the advice of an independent lawyer of the client's choice and is given a reasonable opportunity to seek that advice; and

(C)    The client thereafter consents in writing to the terms of the transaction or the terms of the acquisition."

On June 10, 2004 (slightly over five months before the Retainer Agreement was executed),

the California Supreme Court held in Fletcher v. Davis, 33 Cal.4th 61, 68-72, 14 Cal.Rptr.3d 58, 63-

66 (Cal. 2004) that an attorneys' lien constituted an "adverse interest" subject to the requirements of

Rule 3-300 as follows:

"Applying the correct test, we agree with Davis and Fischbach that it was reasonably foreseeable the charging lien could become detrimental to the client. Although a charging lien does not grant an attorney the power to summarily extinguish the client's interest in nay recovery, a charging lien could significantly *impair* the client's interest by delaying payment of the recovery or settlement proceeds until any disputes over the lien can be resolved. For example, when there is a dispute over the existence or

amount of an attorney's charging lien, the attorney can prevent the judgment debtor or the settling party from remitting the recovery to the client until the dispute is resolved. [Citations omitted.] Alternatively, when the settlement draft is made jointly payable to the client and the attorney, the attorney may refuse to endorse the check until the dispute is resolved. [Citation omitted.] Even when the proceeds have been deposited in the client's trust account, the attorney may withhold an amount equivalent to the disputed portion. [Citation omitted.] In each of these instances when the charging lien is disputed, the client's recovery will be "'tied up until everyone involved can agree on how the money should be divided ... or until one or the other brings an independent action for declaratory relief.'" [Citation omitted.]

In sum, a charging lien grants the attorney considerable authority to detain all or part of the client's recovery whenever a disputed arises over the lien's existence or its scope. That would unquestionably be detrimental to the client. [Citation omitted.] <u>A charging lien is therefore an adverse interest within the meaning of rule 3-300 and thus requires the client's informed written consent. Requiring the client's informed written consent has the additional benefit of ensuring that the client truly agrees to the creation of the lien and its scope, thus making it less likely that a disagreement will arise that could lead to litigation or other action adverse to the client, and also impressing upon the client the importance of his or her consent and of the right to withhold it.</u> (Cf. *Chambers v. Kay* (2002) 29 Cal.4th 142, 157 & fn. 126 Cal.Rptr.2d 536, 56 P.3d 645.)

\*     \*     \*

"Finally, our holding that an attorney's charging lien to secure payment of hourly fees is adverse within the meaning of rule 3-300 does not compromise the public policy in favor of attorney liens. Rule 3-300 does not bar attorneys from obtaining liens on future recoveries. <u>The rule merely requires the attorney who wishes to obtain such a lien to explain the transaction fully,</u> to offer fair and reasonable terms, to provide a copy of the agreement, to give the client an opportunity to seek independent legal advice, and to secure the client's written consent....

"We therefore conclude that an attorney who secures payment of hourly fees by acquiring a charging lien against a client's future judgment or recovery has acquired an interest that is adverse to the client, and so must comply with the requirements of rule 3-300. Fletcher failed to comply with the rule. Accordingly, Fletcher's lien may not be enforced in this proceeding...." (<u>Id.</u>, 33 Cal.4th at 68-72, 14 Cal.Rptr.3d at 63-66; footnotes omitted; emphases added.)

In <u>In re Segovia</u>, 387 B.R. 773, 783 (Bkrtcy.N.D.Cal.2008), the bankruptcy court held that an attorneys' lien was invalid for failure to comply with Rule 3-300 in the following circumstances:

"On December 16, 2005, Olga, Patricia and Maria signed a form entitled California Voluntary Attorney's Lien that Victor had completed (the Lien Form). The Lien Form specified the amount of fees to be secured

as $726,000, and identified the Property by assessor's parcel, street address, and metes and bounds. The Lien Form was recorded on the same day it was signed. The Lien Form does not inform the clients that they may consult independent counsel before executing the form. It is not clear how much time the clients were afforded to consult independent counsel between the time they were presented with the Lien Form and the time they signed that form.

"Victor did not explain to his clients either orally or in writing, either in 2003 or in 2005, that his holding a lien on the Property could enable him to force a sale of their residence without their consent. Nor did he explain that his holding a lien on the Property could prevent them from selling or borrowing against the Property without either paying his lien in full or obtaining his consent. None of the clients at any time actually consulted independent counsel about the Fee Agreement or the Lien Form.

"Based on the facts set forth above, I determine that the attorney lien asserted by Victor is not an enforceable lien created in compliance with Rule 3-300." (Id., 387 B.R. at 783; emphasis added.)

In the instant case, the Retainer Agreement contained the following provisions as to M&M's attorneys' lien:

"You hereby grant us a lien on any and all claims or causes of action which are the subject or our representation of you pursuant to this agreement, as well as any and all other claims or causes of action which we may advance for you in connection with any other mater where we have been retained to act or have acted as counsel on your behalf. This lien shall be for the full amount of attorneys fees and costs owed to the firm on all matters, regardless of the matter or matters that those fees and costs relate to. This lien will be in addition to any other rights we may have to recover sums owing from you under this agreement. If you so desire, you may seek the advice of independent counsel of your choice with regard to the liens you are granting us hereunder, and we will of course give you the time necessary to do so. By signing this agreement you are consenting to the granting of the liens specified herein."

While Modtech and MSL have stipulated that M&M complied with all of the mechanical requirements of Rule 3-300, MSL submits that it is M&M's burden to establish by clear and satisfactory evidence that it adequately disclosed the reasonably foreseeable adverse consequences of the granting of an attorneys' lien to Modtech prior to Modtech's execution of the Retainer Agreement, as in the absence of either such disclosure or Modtech's actual consultation with independent counsel, Modtech's "informed written consent" (Fletcher, 33 Cal.4[th] at 69, 14 Cal.Rptr.3d at 64; emphasis added) cannot be established. See, e.g., Mayhew & Benninghof, 53 Cal.App.4[th] 1365, 1369, 62 Cal.Rptr.2d 27, 30 (Cal.App.4 Dist. 1997) ["Rule 3-300 of the Rules of

1   Professional Conduct requires attorneys who enter into business transactions with their clients to

2   first advise them to seek 'the advice of an independent lawyer of the client's choice.' The attorney is

3   further obligated to give 'his client "all that reasonable advice against himself that he would have

4   given him against a third person."'" (Emphasis added.)]; Roberts v. Wachter, 104 Cal.App.2d 271,

5   231 P.2d 534, 538 (Cal.App.2 Dist. 1951) [where a confidential relationship exists between attorney

6   and client and attorney profits from dealings with client, rebuttable presumption of fraud and undue

7   influence arises, and presumption can only be overcome by clear and satisfactory evidence that

8   transaction between attorney and client was fair and equitable, that attorney had taken no advantage

9   of relationship and that client was fully informed as to all matter relative to transaction].  In an

10  analogous context, Rule 3-310 of the California Rules of Professional Conduct provides that, in

11  order to an attorney to accept or continue the representation of a client where the attorney has

12  previously had a relationship with a party or witness in the same where the previous relationship

13  would substantially affect the lawyer's representation, the attorney must provide written disclosure

14  to the client, with "disclosure" defined as "informing the client or former client of the relevant

15  circumstances and of the actual and reasonably foreseeable adverse consequences to the client or

16  former client".  (Rule 3-310(A)(1).)

17      Here, the parties have stipulated that (1) Modtech did not consult another lawyer regarding

18  the terms and conditions of the Retainer Agreement (SOF, Fact 19) and (2) none of the parties to the

19  Retainer Agreement recall any discussion or communication regarding the "lien" language therein

20  prior to Modtech's execution of the Retainer Agreement.  (SOF, Fact 21.)  As a result, M&M has not

21  met, and cannot meet, its burden of establishing that Modtech was fully informed of the reasonably

22  foreseeable adverse consequences to Modtech of agreeing to the lien (i.e., as noted by the California

23  Supreme Court in Fletcher, that the attorney could tie up that portion of settlement funds claimed to

24  be subject to the attorneys' lien if a dispute ever arose over the lien's existence, perfection or scope).

25  As a result, the Claimed M&M Attorneys' Lien is invalid and unenforceable ab initio.

26  **B.**   **Even If The Claimed M&M Attorneys' Lien Were Not Invalid Ab Initio, It Was Not
        Properly Perfected.**

27      Pursuant to California Commercial Code §9310(a), with exceptions not here relevant, "a

28  financing statement must be filed to perfect all security interests and agricultural liens."  While prior

1   to July 1, 2001, the division 9 of the California Commercial Code did not apply to tort claims

2   pursuant to former California Commercial Code §9104(k), since that date only <u>commercial</u> tort

3   claims are so excluded. <u>See</u> California Commercial Code §§9102(a)(42) [the definition of "general

4   intangibles"] and 9109(d)(12).

5       Here, it is admitted both that (1) M&M never filed a UCC financing statement with the

6   California Secretary of State with respect to the Claimed M&M Attorneys' Lien (SOF, Fact 36) and

7   (2) all of the recoveries to which said lien currently attaches, or will in the future attach, are or will

8   be the result of, or based on , commercial contract claims (SOF, Fact 38).  Accordingly, the Claimed

9   M&M Attorneys' Lien is unperfected unless California law provides another basis for its perfection

10  which overrides the detailed scheme set forth in division 9 of the California Commercial Code.

11      Previously, M&M has indicated that it relies on the decision in <u>Bluxome Street Associates v.</u>

12  <u>Woods</u>, 206 Cal.App.3d 1149, 254 Cal.Rptr. 198, (Cal.App.1 Dist. 1988).  In <u>Bluxome</u>, the court

13  held that an attorneys' lien for fees <u>unrelated</u> to the creation of the settlement proceeds in question

14  was properly perfected by the execution of the contract creating that lien in that (1) the then

15  applicable version of the California Commercial Code (former Section 9104(k)) expressly excluded

16  the tort claims in question so that a "UCC financing statement did not operate to provide notice of or

17  'perfect' the lien"  (<u>Bluxome</u>, 206 Cal.App.3d at 1156, 254 Cal.Rptr. at 202) and (2) there was no

18  other notice provided for or required by any other statute or case law to perfect an attorneys' lien or

19  tort claims (<u>id.</u>, 206 Cal.App.3d at 1157, 254 Cal.Rptr. at 203).

20      In <u>In re Croshier</u>, 228 B.R. 468, 471-3 (Bkrtcy.S.D. Cal. 1998), the bankruptcy court for the

21  Southern District of California set forth a thorough discussion of the law applicable to the perfection

22  of attorneys' liens as follows:

23      "In determining the validity of a lien or other interest in property,
        bankruptcy courts must apply state law....

24

25      "In the present case, the California Supreme Court has spoken on
        the assignment issue. In *Pacific Gas & Elec. Co. v. Nakano*, 12 Cal.2d 711,

26      714, 87 P.2d 700 (1939), the Supreme Court held a tort cause of action is
        not assignable before final judgment....

27

        *Pacific Gas* has been extensively cited and its holding was recently
28      acknowledged in *McKee v. National Union Fire Ins. Co.*, 15 Cal.App.4th

282, 288, 19 Cal.Rptr.2d 286 (1993) (recognizing that prior to final judgment a plaintiff with personal injuries has only a chose in action, and this type of claim is not assignable).   Additionally, the California Commercial Code which governs security interests in personal property, recognizes a tort claim in not assignable).  Section 9104(k) provides Article 9 does not apply to "[a] transfer in whole or in part of any claim arising out of a tort."  The accompanying Commercial Code Comment cites *Pacific Gas*, and indicates a tort cause of action before final judgment is not assignable.

California recognizes an exception to this prohibition for an attorney's charging lien upon a prospective judgment to secure payment of legal services incurred <u>in the action</u>. *Cetenko v. United California Bank*, 30 Cal.3d 528, 531, 179 Cal.Rptr. 902, 638 P.2d 1299 (1982); *Haupt v. Charlie's Kosher Market*, 17 Cal.2d 843, 845-6, 112 P.2d 627 (1941). <u>Although not perfected, public policy supports upholding liens securing payment of related legal fees because persons with meritorious claims could otherwise be deprived of legal representation</u>. *Cetenko*, 30 Cal.3d at 535-36, 179 Cal.Rptr. 902, 638 P.2d 1299.  This type of lien is an "equitable assignment" and is valid even though a tort cause of action is in itself not assignable. *Haupt*, 17 Cal.2d at 845-6, 112 P.2d 627.

There have been some decisions which have upheld prior contractual liens despite the holding of *Pacific Gas*.  These decisions recognized a contractual lien cannot be perfected under Article 9. Nevertheless, they upheld the lien and granted it priority over a subsequent judicial lien. For example, *Bluxome Street Assoc. v. Fireman's Fund Ins. Co.*, 206 Cal.App.3d 1149, 1158-59, 254 Cal.Rptr. 198 (1st Dist. 1988), upheld a contractual lien in a tort cause of action against a subsequent creditor who filed a "notice of lien" in the action. <u>The court recognized the contractual lien was not an equitable charging lien because it secured **unrelated** services, and the attempted perfection under Article 9 was a legal nullity</u>. *Bluxome*, 206 Cal.App.3d at 1154-56, 254 Cal.Rptr. 198. Nevertheless, the lien was deemed a valid contractual lien under Civil Code §2881, and afforded "first in time" priority over the subsequent notice of lien. *Id.* at 1156, 254 Cal.Rptr. 198.  Although factually similar, the court never mentioned *Pacific Gas*.  It appears *Bluxome*'s holding is contrary to *Pacific Gas*, which has never been overruled....

<u>The Court recognizes attorneys' charging liens are excepted from the holding of *Pacific Gas* because they arise in equity</u>....

"Because Ms. Weinberger might be able to enforce the lien against the Debtor, the Court considered the Trustee's argument that the can avoid the lien under 11 U.S.C. §544(a).

"Ms. Weinberger could have cited *In re Hilde*, 120 F.3d 950, 952 (9th Cir.1997) to argue her lien is enforceable against the Trustee <u>because she has a contractual lien recognized under Civil Code §2881 with no state law mechanism of perfection</u>.  Indeed Article 9 **excludes** her lien from its statutory perfection scheme thereby confirming the lien need no be

perfected.    However, upholding the lien against the Trustee would turn
*Hilde's* rationale on its head."    (Id., 228 B.R. at 47103; footnotes omitted; emphases added.)

Applying the principles aptly explained in <u>Croshier</u> to the instant circumstances, and assuming the Claimed M&M Attorneys' Lien is not invalid <u>ab initio</u>, the following two conclusions are dictated:

1.    while public policy allows the enforcement by an attorney of an equitable charging lien even against a judgment creditor to secure the legal service incurred in the action resulting in settlement proceeds, it does <u>not</u> allow such a charging lien to secured <u>unrelated</u> services[1]; and

2.    since at all relevant times the California Commercial Code, and in particular sections 9102(a)(42) and 9109(d)(12), clearly included contractual liens on commercial contract claims within division 9's statutory perfection scheme, M&M's failure to file a UCC financing statement with respect thereto means that said liens were not properly perfected and are subject to avoidance pursuant to 11 U.S.C. §544(a).

### IV.    CONCLUSION

In light of the foregoing points and authorities, this Court should grant summary judgment in favor of MSL against M&M.

Dated:    December 28, 2009          PACHULSKI STANG ZIEHL & JONES LLP


By    */s/ James K.T. Hunter*
      James K.T. Hunter
      Counsel for Defendant Modtech Structures
      LLC

---

[1]    A review of Exhibit "B" to the SOF establishes that out of the total Pre-Petition Fees/Costs of $776,336.39 at most $5,374.00 (or $5,581.00 - $207.00) relates to the J T Plastering matter (from which $46,519.66 of the escrowed funds derive) and $6,093.05 (or $6891.00 - $797.95) relates to the Heritage High School matter (for which $313,728.35 of the escrowed funds derive).    Accordingly, in the event this Court determines that the Claimed M&M Attorneys' Lien is valid <u>ab initio</u>, MSL stipulates that M&M is entitled to $11,467.05 out of the escrowed funds based on M&M's equitable charging lien for costs and fees related to the J T Plastering and Heritage High School matters.